We'll hear argument first this morning in Case 11-1351, Levin v. United States. Mr. Feldman. Mr. Chief Justice, and may it please the Court, as the language and structure of the Gonzales Act demonstrate, Congress did not completely eliminate the long-recognized tort remedy that's available to essentially everybody else in the country when doctors perform surgery without a patient's consent. By abrogating the intentional tort exception to the FTCA for the class of cases covered by the Gonzales Act, Congress both preserved a remedy for the victims of that tort, and by virtue of the Gonzales Act's exclusive remedy provision, they made certain that the Federal employees themselves would not be sued. As everyone understood at the time of the enactment, that was the meaning of the terms of the Gonzales Act. The Act has two clauses, an operative clause and an introductory clause. The operative clause says in simple declarative terms that the intentional tort exception to the Federal Tort Claims Act shall not apply to any cause of action arising out of a wrongful act or omission in the performance of medical functions. Ginsburg, but it says first, for purposes of this section, and as I understand your argument, those words don't count. In other words, you would be making you would interpret the statute the same way if the sentence started with the provisions of section 2680H. No, Your Honor, that's not right. We enter the that the part after the introductory clause says the provisions of the intentional tort exception shall not apply to medical malpractice cases. And that would make it apply across the government to any government employee who is performing those medical functions. By saying for purposes of this section, Congress limited it in accordance with the case, the agency by agency approach that it had adopted in this area and limited it to just the cases that are covered by the Gonzales Act. That is, by malpractice that's committed by doctors of the Department of Defense, the National Guard, the Armed Forces Retirement Home, and so on. And so the each clause serves quite an important function. Congress had before the Gonzales Act, they had already passed statutes dealing, for example, with a public health service that's essentially written in the same terms, with the Veterans Administration, although part of that was then added later, with the State Department doctors, and so on. And so they were proceeding on an agency by agency basis, and the way to accomplish that was to first say, we think that the intentional tort exception should not apply to these cases, because medical batteries of the sort that is alleged in this case are so close to the kinds of medical malpractice cases that are going to be brought against the government anyhow. But then in each statute, they say for purposes of this section, because it's only the agencies, only the personnel covered by those sections, and the torts covered by that section. Ginsburg-Gilmour The Veterans Administration, it doesn't say that, does it? Yeah. Verrilli, The Veterans Administration, originally, the original Veterans Administration statute, which was from about 1965, doesn't have this 1089e intentional tort exception at all in it. But then they added it later, about 10 years after this statute, and then they added a provision that was slightly worded differently, but it achieves exactly the same result. Instead of saying for purposes of this section, it says by the personnel named in section A, which accomplishes exactly the same thing. And actually, if you look at the history of that statute, the Senate report on that statute quite clearly recites that Congress understood that 1089e, the statute here, has exactly the effect that I said, and they said we are modeling it on that provision. And then they did tinker with the wording, and there's actually no explanation for the specific change. But it's not uncommon that in statutes that have been reviewed by different committees and passed 10 or 12 years apart, that Congress would have a — that they use slightly different language to achieve essentially the same purpose. Breyer, What do you do, if anything, about those of us, I hope more than one, who actually look at legislative history, and the House and Senate report, the Senate report says subsection E would nullify a provision of the Tort Claims Act, which would otherwise exclude any action for assault and battery. And then the House says about the same thing. So when I look at those two things, I think the purpose of this Act was to do just exactly what the other side says. It was to get rid of assault and battery as an exception and say the government of the United States will pay for unlawful assault and batteries. That's what the two reports say, that that's why they passed it. Right. I believe actually that's our — that's the way we read it exactly like that, which is the — by nullifying the intentional tort exception, what the intentional tort exception provides is actually what it says, is the provisions of the — of the Federal Tort Claims Act shall not apply to any case arising out of assault, battery, and so on. And by eliminating that, the provisions of the Federal Tort Claims Act are otherwise totally applicable to cases of medical battery like this or other kinds of intentional tort. And so for cases covered by the Gonzales Act, that is, cases of medical malpractice committed within the scope of employment by the doctors of the certain specified agencies that Congress has named, for those cases, there is no intentional tort exception, and therefore you can bring an action against the government. Roberts, I don't quite understand your answer to Justice Ginsburg on the — for purposes of this section. What the section does is provide that the remedy against the United States is exclusive. But what the 1089e goes on to say is that the 2680h provision doesn't apply. So I don't see how that — I mean, the reference is to the exclusivity, not to the waiver of the limitation on intentional torts. Well, I don't think that that's right. I mean, I think for purposes of this section, you have to read it in context. And the fact is that 2680 — the term 2680h of Title 28 doesn't appear elsewhere in the Gonzales Act. The only work that that provision does in the law, section — the intentional tort exception 2680h of Title 28, the only work that that does is to make the Federal — is in the Federal Tort Claims Act, is to make the Act inapplicable to those kinds of cases. So when they say in simple terms, that shall not apply, all that could mean, all that could possibly mean is you eliminate that and then you have the Tort Claims Act how it is. And then what the for purposes of this section does is say, but we're not doing that across the board for every Federal employee everywhere or even every medical malpractice case. We're just doing it for the claims that are covered, for the cases that are covered in this section, for purposes of this section. In this section, if you look at A, then, A, which is the, you know, basic exclusive remedy provision that Your Honor mentioned, what A does is deal specifically with intent — with medical malpractice committed by doctors and health care. Sotomayor, one of the strongest arguments by your adversary has to do with the incongruity between these claims and the Westphal ruling by this Court. It's more a policy argument than a language argument, but how do you address the fact that we will be interpreting essentially two statutes that are almost identical but with different conclusions now, if we were to adopt your view? Right. I think there are a few reasons why the statutes have to be construed differently. I mean, one is that if you look at the Court's decision in Smith where it construed that provision of the Westphal Act, it — the Court never suggested that the language — the part of the Westphal Act whose language is the same as this supported its conclusion there. It was relying on other provisions in the Westphal Act. In particular, there was a provision that said once the government substitutes itself for the defendant, the case shall proceed subject to all the exceptions and limitations in the Tort Claims Act. And the Court said, well, yes, well, that — that gives us a clear understanding that whether there's exceptions or not, we want that case to proceed that — to proceed. That provision isn't here in the Gonzales Act. And there was another provision in the Westphal Act, in the Smith case, in the Westphal Act, that dealt with making a specific exception for Bivens cases. And again, that provision isn't here. And that is— Why — why would Congress want to treat them differently? Right. I think the reason is when they were dealing in this case with this area in 1976, they were dealing with a specific problem of medical malpractice. And they were looking at that problem, doctors, doctors had to get insurance. What are we going to do about that for Federal employees? And they were — when they focused on that problem, actually, as the executive branch itself said in a letter that it sent to the Senate committee, it said there's an urgent need both to assure adequate remedies for tort victims and to protect Federal employees, and that's what they were trying to do here, and I think you see it throughout the Gonzales Act. Scalia But why did they feel the need here to assure adequate remedies for tort victims where they did not in the Westphal Act? I mean, you know, injured tort victims are injured tort victims. It does seem, you know, rather odd that in one instance Congress would be concerned and the other not concerned. Right. And I think the difference is that here they were dealing specifically with a problem of medical malpractice. Twelve years later, when they got around to the Westphal Act, they weren't looking at medical malpractice. They were looking generally at a whole — the whole problem of government employees being sued after this Court's decision in the Westphal case, a problem that particularly affected, actually, lower-level government employees who were, it's clear, couldn't take advantage of the discretionary function exception. And when they're looking at that broad universe of employees, they took a different approach and decided, well, we're just going to — some people are just going to be out of luck because this is — it's a determination that Congress made, felt was appropriate there. But when it was looking at the specific problem of medical malpractice in the Gonzales Act, it definitely took the position, as everybody said at the time and as the structure of the Act itself showed, that they wanted to preserve remedies. And there are two provisions in the Westphal Act that make that clear. Alito, you could address this in slightly more concrete terms. You have two situations. In one case, a Federal employee who's driving a car deliberately runs somebody down. And in the second case, a government doctor grabs somebody who doesn't want an operation and performs the operation anyway. Now, as — under your reading, there would be a claim against the government in the second situation, but not in the first situation. Is that right? That's correct. Why would Congress want that? The reason they'd want it is this. In the first situation, that really arose, that problem came with the Tort Claims Act when it was first enacted in 1946. And when Congress was looking at the universe of Federal employees, they felt, and especially given the law at that time and that continued really up to the present, that when a Federal employee or average Federal employee, for the types of intentional torts that they commit, especially a battery, it's extraordinarily unlikely that that's going to be within the scope of that employee's employment. And Congress felt, well, we want to just eliminate that altogether. It's not just to hold the government responsible for that kind of a claim when some kind of medical malpractice or something like that, and that was a determination they made. When they got around to 1976, to dealing with the particular problem of medical malpractice, it doesn't actually usually happen. These kinds of claims don't arise nowhere, anywhere. A doctor just grabs somebody and throws him physically into the operating room. They happen when the doctor is performing some procedure and performs a different procedure or a procedure that was not authorized by the patient. And that's — that is very closely related to core medical malpractice claims of exactly the sort that they were dealing with here. It's very closely related to informed consent claims, which I believe the government — I read the government to be conceding could be brought against the government. And they thought there was no reason to distinguish in — to distinguish one type of medical malpractice from another. We want all of these claims. We want to provide a remedy, and they all should be brought against the government. I would add one other thing. Kennedy, in your view, commentaries, and maybe in lower court's opinion, is there — is it fair to say that the weight of authority is to criticize the battery negligence distinction as being productive of litigation and not really making a lot of sense? I think that is fair to say. And, you know, States, a lot of States have dealt with this by dealing with statutory statutes, not in a common law development, so they could kind of rationalize the system and say, look, this is the kinds of claims you're going to have. But the key thing is that everybody in the country, I think, under every State's law, if a doctor performs an operation that you didn't consent to, you have an action in tort, and that protects both you and provides an incentive, an important incentive, to doctors and medical personnel to be sure that they're only doing what they're authorized to do. And there's not a hint that when Congress was dealing with the Westfall Act — I keep saying the Westfall Act — when Congress was dealing with the Gonzales Act, there's not a hint that they were trying there to say, well, we want to save money or something by eliminating those kind of very, very traditional tort claims from those victims, and we don't want those people to have compensation. Ginsburg. Ginsburg. Mr. Feldman, do I understand the mechanics of this right, that if the injured person sued the United States directly, that suit would fail because the battery exclusion would apply, but it's only by suing the officer, the doctor, and then getting the United States substituted, that the battery exception is abrogated. Is that right? No, I don't believe that that's correct. There's nothing in this Act that says it should make any difference. There's nothing, certainly in subsection E or anywhere else in the Act, that says it should make any difference whether you're suing the government or suing the doctor. You sue the government, the government says, well, we have a defense that the intentional tort exception applies. You would say, no, it says here, for purposes of this section, the intentional tort exception does not apply. And what that means, for purposes of this section, is for claims that are covered by this Act, which is claims that are medical tort claims brought against personnel of the affected agencies who are acting within the scope of their abuse. Sotomayor, are there any other tort claims besides the lack of consent, battery claim, at issue here, that could be encompassed by the Intentional Tort Act as it relates to medical malpractice? Let's assume that it's not an operation, but sexual behavior with a patient in their hospital room, something of that nature. Is that covered under the Gonzales Act as a claim against the United States? If it would be an assault or battery that was committed by the — within the scope of the professional's employment, then it would be. But it's always the question of whether it's within the scope of employment. And I think usually the case law — I mean, I think usually the cases are that a doctor who commits a sexual assault on a patient or something is not acting within — in the kind of circumstance that you're talking about, is not acting within the scope of employment. But that would be a case-by-case determination. There might be some kind of case where it would depend on the facts of the case. Sotomayor, this exception you're talking about is regularly applied in the lower courts? In the lower courts, this determination is regularly made? The scope of employment determination is made every day, because that's made — that is applicable throughout in any kind of respondeat superior situation, whenever the employer of the medical professional is sued and that kind of thing, or nonmedical professional, for that matter. Scalia, when the government removes the case, it concedes that point, doesn't it, normally? Where a case is removed from State court, the government, the attorney general, must certify that it was within the scope of employment, no? That's correct. That's correct. And that is actually one of the two — one of two of the key provisions of the Act that kind of establish the — make it very clear that what Congress was trying to do was preserve remedies, because in that very provision, after it talks about removing, when the attorney general has certified it's within the scope of employment, it says the case can be remanded if the removed case is one such that there is — that no remedy against the United States is available. And what that shows is that Congress knew that there would be actions that would continue to be brought against doctors, and they actually wanted to provide for that right there and say it should be — those should be remanded to State court, and they'll now proceed against the doctor in State court. Then there's — so that there would be — What would that case, where no action against the United States is available? That would be a case, for example, of — Not by reason of the battery. No, it wouldn't be — if Congress didn't have this provision in the statute, it would have been by reason. Yes, yes. Another one would be a foreign tort, which is also another exception under the Tort Claims Act, a discretionary function case, and there are some in the medical context, or one of the other exceptions. All of those exception cases, they go on, they go on, and Congress — Congress could have closed all of them down. And in fact, if Congress was worried that there would be — really, if their sole purpose here was to say we don't want any actions to be brought against Federal employees, they should — they could have just said we don't want any actions to be brought against Federal employees, but instead, they're providing for what happens and for the continuation of the action against the doctor. Now, the government has an alternative interpretation, and I know you think it's wrong, but would you go further and say that it's not a plausible interpretation? I would. I think that because as the Court — when the Court used, you know, a number of different formulations to talk about that, I think you're referring to the kind of strict construction rule that applies to waivers of sovereign immunity, which we don't think is applicable here. But even where that rule does apply, really the question is, is it a reasonable degree of clarity that Congress intended to waive immunity? Is it, as the Court has said, is it clearly discernible from a fair reading of the statute that they intended to waive? And it has to be clear, and I think it is clear here. And that was what everybody at the time of the statute thought. It's what the government itself thought up through the time of the — of the Smith case. Alito But was the interpretation adopted by the district court and by the Ninth Circuit? But you still say it's implausible. I think so. I would add that the — I'm not here to defend the Ninth Circuit's judgment, but I would add that they had a pro se litigant for them, and I don't think they had access to the full degree of presentation that they might have had if it had been more fully developed. But I do think that when the Court is making that determination of what's clearly discernible from a fair reading of the statute, the Court has also made it clear, though, that what you don't do is take each word in the statute and say we're going to take the most pro-government meaning of this word and then you add them all together. What you do is you look at the statute as a whole, you look at the context of the statute, you look at the structure of the statute, and then you say what is plausible, what is clearly discernible from a fair reading. Ginsburg Mr. Feldman, when the Westfall Act, which doesn't abrogate the intentional tort provision, when that was passed, why — was there any reason why Congress kept these 506 separate acts, like the Gonzales Act, instead of saying, well, we did this piecemeal for particular agencies, now we're dealing with Federal employees across the board, so there's no reason why we should have these 506 that go another way? Feldman Well, I can give you the answer that the government gave in its brief in Smith, which is the Gonzales Act and the other four or five statutes continue to serve two, at least two, vital functions. And one is specifically this, that they eliminate the intentional tort exception and therefore allow relief for victims of intentional tort in this medical malpractice context, just like victims of other kinds of malpractice. The other thing is there are some cases, for instance, foreign torts, where there is another provision of the Gonzales Act, 1089F, that provides for indemnifying or holding harmless doctors when judgments are against them in certain — when there's a foreign tort, when the doctor has been detailed to a non-Federal agency, or if the circumstances are such as are likely to preclude a remedy under the Tort Claims Act. So again, Congress in that — that provision remains important because there could be a foreign judgment against the doctor or something even after the Westfall Act, and that would — that gives the authority to reimburse the doctor if the agency determines that that's appropriate. But that provision also shows that Congress intended that — to preserve remedies here, because it would have made no sense for Congress to say, we want to provide for the indemnification or reimbursement of the doctor if what they really were trying to do was eliminate all the cases against doctors. Kagan. Mr. Feldman, is this the case?  Mr. Feldman, is this the case? Scalia. It's right on the same thing, so I — that provision ends, and I'm strengthening your last point. That provision ends if the circumstances are such as are likely to preclude the remedies of third persons against the United States, described in Section 1346B of Title XXVIII. That clearly envisions that, in the ordinary case, those remedies against the United States would not be precluded. That's right. And the — and the choice that Congress had here really was between taking intentional tort cases and allowing them to be continued to be brought against doctors and then subject to this kind of reimbursement provision, which they had provided for, or saying, no, we want these to just be brought against the government and to protect the Federal employees much more fully. And so that was the purpose of 1089e. They said, we want to steer this into the same channel that all the other malpractice actions are going into. Mr. Feldman, as I understand your argument and the differences that you have with the government, you have one set of differences about the meaning of 1089e, but then another set about this question of if it were true that the government was immune from suit, could you bring a tort suit against the doctors? And the government said — says no, and you say, yes, you might be able to do that. But do we have to answer that question at all in order to say that you're correct on 1089e? No. I mean, that's — that question isn't at issue in this case. That would really only be directly at issue if somebody brought a suit against the doctors. So there's a lot of going back and forth about this question of what would happen if the government were immune, would the individual doctor be immune. But that's essentially irrelevant to the question before us. Is that correct? I just wouldn't say it's irrelevant, because what the provisions that I've been talking about show is that Congress — Congress was not trying in this Act, unlike in the Westfall Act, which doesn't have either of these two provisions, the reimbursement and the remand provision that I talked about, unlike in the Westfall Act, Congress wasn't trying to save money or other — do something else by just eliminating remedies for victims. It was trying to, as the executive branch said, as I said, to assure remedies for all tort victims and to protect doctors in a variety of different ways. And given that that's what they were trying to do in the Gonzales Act, and it — which is clear from the structure, that also helps clarify what 1080 — or makes more clear what 1089e means. Kagan, I'll say it in a different way. I don't have to accept your broader argument. I can remain ambivalent about your broader argument and still accept your narrower argument. Is that correct? Yes. Yes, that is correct. I would add that with respect to the strict construction standard, I don't think that it does apply in this context. The Court has never applied it in a Federal Tort Claims Act context. In the Gonzales Act, 1089e specifically refers to the Federal Tort Claims Act. It says section 2680H of Title 28. Each of the other provisions of the Gonzales Act for their operation also depend on the Federal Tort Claims Act. The Exclusive Remedy provision talks about the Tort Claims Act, the Reimbursement provision, the Remand provision, each of them. The whole statute is really part of the Federal Tort Claims Act machinery. And when Congress invoked that machinery here, I think it knew and I think it was consistent with this Court's precedence that the Court applied the same rule that it applied in the Dolan case, which is construing the words in accordance with their reason and normal tools of statutory construction without a strict construction rule. Although, as I said, I do think that it is clear what the meaning of the provision is if they do – if you do apply the rule. Thank you. Roberts. Thank you, Mr. Feldman. Mr. Shah. Mr. Chief Justice, and may it please the Court. Subsection E of the Gonzales Act states, in pertinent part, that for purposes of this section, which refers to the Gonzales Act, the FTCA's intentional tort exception shall not apply. The question in this case is whether those words unequivocally waive sovereign immunity for medical battery claims like Petitioner's. The answer is no. Roberts. Well, the unequivocally – we have a lot of cases that say you don't get – you certainly get the benefit of the unequivocally standard when you're talking about a waiver of sovereign immunity in the first instance, but you don't keep getting the benefit over and over again when you're talking about, as in this case, an exception to an exception to an exception. Well, Your Honor, I think the canon actually applies most strongly in this set of circumstances. And let me talk about Dolan and the line of cases, which recognizes a very narrow exception to the normal presumption against waivers of sovereign immunity. Dolan and its predecessor cases recognize a narrow exception to the canon when construing the scope of exceptions that were enacted alongside the broad waiver of sovereign immunity itself, and the purpose of drawing that exception to the canon was it didn't want – the Court didn't want to defeat Congress's purpose as manifest in the broad waiver itself. Those exceptions were cutting back on the contemporaneous waiver of sovereign immunity. The Court said we don't want to cut back given the uniquely broad waiver that the FTCA enacts. It's a narrow rule exception limited to those circumstances that hasn't been applied outside those circumstances. Unlike those cases, this case is not construing the scope of an exception that was enacted alongside the FTCA that was trying to cut back on the waiver of sovereign immunity. To put it more concretely, on the day before the Gonzales Act was enacted, there was no question that sovereign immunity barred the type of claim at issue. That is, no one had any dispute that the FTCA's baseline of sovereign immunity applied and would have blocked this claim. The question is whether they're going to apply it. Roberts And you're going even a step further to say you get the benefit of the unequivocal test that you've set forth at even the next stage. No, you've already used up your benefit of an unequivocal requirement when you've got the interpretation of the FTCA itself, which is the waiver of sovereign immunity. Well, Your Honor, we haven't used it up because of the scope of interpreting Section 2680H.  If we were just talking about construing the scope of Section 2680H itself, I would agree completely with you. What we have here is some years later, we have a baseline of sovereign immunity. Everyone agrees that the FTCA and its exceptions have struck the appropriate balance. Roberts You agree with me that you don't get the benefit of your higher standard of interpretation with respect to 2680H? With respect to the terms of 2680H as enacted at that time. Roberts But then the heightened standard of view sort of resurrects again when you get to considering an exception to 2680H. The reason, Your Honor, is that you have a baseline of sovereign immunity. What 26 — in order for the other side to prevail, Section 1089e has to waive sovereign immunity. It has to enact a new waiver of sovereign immunity that undisputably applied the day before the Gonzales Act. That is when the canon should apply most strongly, when the other side is saying  Sotomayor What do you need more clear than H doesn't apply? I mean, I don't know how much clearer Congress has to get than to say it's nullified. Roberts Sure. Sotomayor What more does it have to say the exception doesn't apply and then what's left? Roberts Your Honor, if all it said is that the intentional tort exception does not apply, I would agree with you that that would be enough. And that's exactly what Congress said in the 1980s. Scalia It didn't want to say it shall not apply for everything. It didn't want to eliminate the intentional tort exception for everybody. Right? It only wanted to eliminate it for the people covered by the Gonzales Act. Roberts That may well be true. And Congress, when it enacted the 1988 VA Act, did it in the most direct way. It said the intentional tort exception shall not apply with respect to personnel employed by the VA. Scalia It might have said that, but if it wanted to be more parsimonious in its language, it could simply say for purposes of this section. Which section applies only to these particular individuals? Roberts Justice Scalia, I think it might be helpful to take a step back. We had four statutes starting in 1965, then 1976. Gonzales Act was part of that chain. All four statutes in this relevant subsection, the analog to subsection E here, said for purposes of this section, the intentional tort exception shall not apply. Then we get to 1988, the last one in the line, which is the VA amendment. It changes that language. It eliminates that opening proviso for purposes of this section. The legislative history accompanying it says, look, we want to allow intentional tort remedies for veterans. It does so. The only reason I can conceive of that Congress would have done it is because it didn't think that the prior four model statutes did it clearly enough. And I think that is the reason. And if we were in a normal statute where it was a different Congress, they don't always use the same language. Go on. Well, Your Honor, they use the identical language. You're lucky they even remember the earlier statutes. Well, Your Honor, they use the identical language in every other provision of that statute. They made an affirmative decision to change the language of subsection E. Now, if this were an ordinary. Sotomayor, what do you do with Justice Breyer's point, or with your adversary's point? I know you'll tell us don't look at the congressional record, because it suits you right now, because when it doesn't, you point to it extensively. But what do you do with the Veterans Act record that says we are modeling ourselves after the Gonzales Act, including its nullification of the intentional tort? Well, Your Honor, it said the first part. It did not say the second part. There is nothing in that legislative history that says it thought 1089E nullified the intentional tort exception. It says it's patterned after the Gonzales Act, and then it changed the main language, the opening proviso of that provision. Now, if this were an ordinary case of statutory interpretation, this Court would have to figure out whether by changing that language, did Congress just want to tinker with the language to clarify its intent, did it intend to have a dispositive change by making that change in language. But this is not an ordinary case. Scalia. Well, listen, I don't much care about legislative history, but if I did, I wouldn't think that you would say it is patterned after another act where you change a very basic provision, whether a suit can be brought against the United States or not. Well, Your Honor, it is patterned. I mean, that's sort of rudimentary and fundamental to it. It doesn't seem to me they would say it's patterned after it. But, you know, I don't care. Well, Your Honor, it is patterned in the sense it does use the operative language. It takes out the key opening proviso, which is the entire dispute in this case. But legislative history, while it might be important if this were a normal statutory interpretation case, this Court has said time and time again you cannot look to legislative history to supply an unequivocal waiver that is not present in the text itself. Well, let's go back to the text then, Mr. Shah. As I understand your argument, it goes something like this. This provision is there to prevent people from drawing a mistaken inference. And the inference would be that the doctors were liable because the government was not. Now, there are a thousand ways to do that pretty clearly. You could just say, irrespective of whether the government is liable, the doctors are not, or some such thing. But instead, what Congress did was it enacted a kind of let's pretend provision, right? Let's pretend that the government is liable. So then the inference won't arise. Now, that has to be not just not the best way of achieving Congress's objective, it has to be the worst, right? Because then you are raising the inference that, in fact, the government is liable. Why would Congress have wanted to do that? Well, Your Honor, I agree with you, Congress could have written this provision in a different way, in more clear ways. But I think it's helpful. I'm saying something more than that. It could not have written it in a worse way. Well, I would disagree with that. But let me take a step back here on sort of the landscape in which subsection E was enacted. Both sides agree that without subsection E, covered medical personnel would have faced the risk of personal liability for medical battery claims. Both sides also agree that subsection E was enacted to obviate that risk and, in fact, successfully does so under either side's construction. Everyone agrees on that. The dispute here is whether Congress accomplished that objective by, A, assuming the existence of an available tort remedy for purposes of the Gonzales Act's conferral of immunity, as the text of the provision suggests, or instead whether it takes a substantial further step of actually amending the FTCA, which is a separate statute, and thereby provide a remedy against the United States. The latter construction I don't think is unmistakably correct. It's not unavoidable. And because of that, the unequivocal waiver requirement favors the government of the United States. Breyer. I'm picking up from — I find Justice Scalia's hypothetical interpretations of legislative history very useful. I'm sorry. The — the — the — and I'm thinking of it. Scalia. Thank you, thank you, dear colleague. Breyer. I appreciate that. The — the thing, I mean, where we are in this, it strikes — we have a — we have a statute, 1089, basically, and it says you can sue the government for the tort of an employee. I'm oversimplifying. I'm oversimplifying. And we should interpret that narrowly. Okay? That's — we should interpret that absolutely has to be definite. And it is pretty definite. Now what we have is an exception to that. And the exception is an exception for battery, but not battery. You can't sue the United States for battery. And we're supposed to interpret that, I guess, as broadly as possible. If you have a plausible argument that it could be broader, you get it, as long as it's plausible. Then what we have, because after all, after these two things, you can still sue the person who hit you over the head. You can go sue them in a State court, can't you? Now, ah, now we bring a new act there. And this new act says we're going to have a little exception to the exception. Right? And we're supposed to interpret that one, I guess, as narrowly as possible. So now what we are, because that's an exception to something that should be interpreted as broadly as possible, which is an exception to something that should be interpreted as narrowly as possible. So I think I get it like Costello used to. I don't know what I'm talking about, because there are a lot of words in these things. And so given all these words in the narrative, this is where the Chief Justice started, I mean, can't we at least look at legislative history to try to figure out what Congress was doing by the time we get to the exception to the exception to the exception? No, no, Your Honor. This Court has made quite clear you cannot look at the legislative history. And the fact that if you find this confusing, Justice Breyer, if you find it's not understandable, it's perfectly clear, we win. And you don't look to the legislative history for clarity. That's the point of what the Chief Justice said. Breyer. Well, I don't find it all that confusing. What it says is that this battery exception, which is in H, is not supposed to apply when we look at the military doctors. That's what it says. And if you say, ah, but it says for purposes of this section. Okay. I look at for purposes of this section, and the purposes of this section, the very first whole sentence, has to do with 1089, and it has to do with the scope. It has to do with the general waiver. Well, the for purposes of this section language, I think, is the key phrase. And this section refers to the Gonzales Act. What the Gonzales Act primarily does, what sections A through C are all about, are about conferring personal immunity. So I think the key words are shall not apply. Shall not apply. It isn't shall be deemed inapplicable. Your Honor, I think when we're reading it. It is not a hypothetical. It says they shall not apply. To any cause of action, et cetera. I think when we're reading it against the canon, the sovereign immunity canon, I think we would expect Congress to speak more clearly. And Congress gave us two examples of how it spoke more clearly in this very context. One is in 1974, the sole the only time it amended Section 2680H, it amended it within the provision itself. That is, it amended the language of 2680H to add a law enforcement proviso that said this exception applies except with respect to law enforcement in certain circumstances. That's what I'm talking about. Breyer. Why would it have wanted to do that? That is to say, look, if you cut the exceptions, the exceptions, the exceptions, the presumptions, da, da, da, out of it, what we've got on your interpretation is that a person who's hurt by a battery committed by a government official, given your interpretation, has no remedy at all. I mean, previously, he could at least have sued in State court. Now what you're saying is Congress tried to do with this language is say, hey, you can't sue in State court. And by the way, when you try to sue the Federal Government, we're not going to give you your suit. Why did it want to do that? I don't think that's true. I think before the Gonzales Act came along, there was a split in the circuits. That's why the Gonzales Act came along. There were circuits that did not allow a claim to proceed personally against the physician. There were circuits that recognized absolute immunity against a personal suit, even while it was undisputed that battery claim could not proceed against the government. And what Congress said, if you want to look at legislative history, what the Senate report says is in light of this D.C. Circuit decision that went the other way, Congress enacted the Gonzales Act, because it was primarily concerned about conferring personal immunity. Every time the Senate report talks about the purpose of the bill, it's on page 1, heading, purpose of the bill, it says conferring personal immunity. Nothing about expanding the government's court liability. Ginsburg. This was not always the government's position. In fact, in a brief to this Court in the Smith case, the government took the position that Mr. Feldman is presenting to us. What occurred to turn on the light for the government to see that it was wrong in the Smith case and come up with this, the interpretation you're now advancing? Sure, Justice Ginsburg. Well, the first thing I would say is that Section 1080-90 was not directly at issue in Smith, and the issue had really been litigated quite sparsely both before and after Smith. Once this case presented itself, the government revisited its position. I think there were two. But this was not a side issue, Mr. Shah. In fact, you used your understanding of 1080-9e as an argument to produce the result that this Court reached in Smith. So it was not a very large issue, but it was an argument. You said, you know, we should reach the result that we want, that you wanted in Smith because 1080-9e would continue to have this effect. Well, Your Honor, I don't agree with that characterization. The government's argument would have been identical with or without 1080-9e, but I don't want to quibble about the other two. It was a supportive argument. I'm not saying that it was the but-for argument, but it was clearly a supportive argument in your brief. Your Honor, if you want to read it that way, I think that's fine. I think there were a few differences. Why else was it there? Just for fun? No, I agree. It was in order to support your position. Now, your position would have been the same. That's true. Your position would have been identical. But the only purpose of that argument was to support that position. Your Honor, I agree. It supported the position. And it was successful. The Court relied on that argument several times in its opinion. I don't believe so, Your Honor. I don't believe the Court. We certainly cited Smith. Yes, but the Court did not interpret 1080-9e. I think what Smith hopefully said, Your Honor, and this is one of the reasons why the government revisited its position. What the Court said in the Smith decision, you don't have to take my word of what the legislative history says. What the Court in Smith itself said is the sole purpose of the Gonzales Act, not the primary purpose, not a purpose, not a chief purpose, the sole purpose of the Gonzales Act, and it's talking about the Gonzales Act as a whole, was to confer personal immunity and not to create malpractice rights in favor of plaintiffs. Your friend says that in Smith, I'm sorry for the confusion, the Court addressed your argument on the meaning of the Gonzales Act several times. Your Honor, it did not address 1080-9e at all, and I think that's plain as day from the opinion. What the Court said in Smith is that the purpose of the Gonzales Act, the sole purpose of the Gonzales Act, is to confer personal immunity, and what it also said is the That was one of the things that the government looked at in reformulating its position, adopting its current position, the decision in Smith which came after our brief. The other thing we looked at was that the purpose of the Gonzales Act, the sole purpose of the Gonzales Act, is to confer personal immunity, and what it also said is the point of the Gonzales Act is that it would enable plaintiffs to pursue those claims against the United States. I know you would have been disappointed if we didn't ask you about this. Yes. You are correct. We said it. This is a change of position. We revisited it. There were a couple of things we looked at in coming to our current position. But because it was — Justice Kagan indicated, this wasn't just an aside. This was rather a central theory for your interpretation of the Act, maybe not the only theory, but a central theory. Again, I disagree fundamentally with that characterization. It's two sentences in our brief. It is — at that back end of the brief, it was not fundamental to the position in Smith. The Court did not rely on it at all in Smith. But even if all that were true, I think the important thing is why we changed our position. The one is — the first and foremost is the statements in the Court's decision in Smith itself, which obviously most States disagree with. I don't find that inconsistent with the position argued by the — you're talking about the statement that the sole purpose was — was to — The two statements, the sole purpose of the Gonzales Act is to confer immunity, not to get — I think it is the sole purpose, even if you accept your friend's interpretation. No. No, no, the sole purpose is to assure immunity to these doctors. Now, in assuring immunity to these doctors, we're not going to leave these people without any remedy, and so we allow them a remedy against the United States. That's subsidiary to the sole purpose of the Act. Sure, the sole purpose is to — is to — is to help these doctors, but in order to do it and be fair at the same time, you have to allow suit against the United States. I think you could still say the sole purpose was to help the doctors. Well, Your Honor, I would disagree with that. The other side's brief says all along the sole purpose of this Act was not just to confer personal immunity, but it had a dual purpose. The dual purpose was to confer personal immunity, and this is time and time again in the other side's brief, to confer personal immunity, and also to provide adequate remedies to tort plaintiffs. That was not, we submit, a purpose, let alone a primary purpose of the Act. Ginsburg. Why would Congress — the Veterans Administration Act came at the — after the four or five others, and Congress thought it was patterning that Act after the Gonzales Act. Why would Congress want to provide this battery remedy if a Veterans Administration medical person messed up, but not if it was an armed service doctor? Of course, Congress doesn't say. I think there are two potential reasons, Justice Ginsburg. One might be, as this Court has recognized, the special solicitude that Congress pays veterans, and it may have wanted to open up remedies to veterans that were unavailable to others. I think the second potential reason is a defense side reason. The defendants in Veterans Act cases are civilian Veterans Administration employees. In a Gonzales Act case, by and large, the defendants are going to be active military personnel. Congress is often hesitant to create, expand judicial remedies against active military personnel because of the risk it poses to interfering with military function and order. So I think those are two reasons why Congress may have decided to change course in the Veterans Act in 1988, after it had four provisions that said exactly the same thing using the four purposes of this Act provision. It changed it, and it must have changed it for a reason. Two potential reasons are to change the result, which of course under which the government would win, or because it thought it needed to speak more clearly in order to waive sovereign immunity, and under the presumption against sovereign immunity waivers, the government would also prevail. Kagan Mr. Shah, your basic theory of the case, which is that in order to make absolutely certain that everyone gets the benefit of the intentional tort exception, both the  if Congress wanted to make absolutely clear Congress writes a provision saying that the intentional tort exception shall not apply. Now, I mean, the position, I have to say, seems to refute itself. If Congress wanted to make absolutely clear that the intentional tort exception would apply, it wouldn't have written a provision saying that it doesn't apply. Shah Well, the provision that you described, Justice Kagan, is not this provision. It's the 1988 Veterans Act amendment, which says the intentional tort exception shall not apply. This provision says for purposes of this section, that is, for purposes of the Gonzales Act's conferral of immunity in subsection A, that the intentional tort exception shall not apply. Now, sometimes when Congress uses the for purposes of this section formulation, sometimes it uses words like assume that or consider that as it as cited in the other side's brief in footnote 4 on page 18. However, other times when it uses for purposes of this section, even though it intends somewhat of a counterfactual inquiry, it eliminates those words. In Title X itself, section 10 U.S.C. 335 says for purposes of this section, the exact language is for purposes of this chapter, the term State includes Guam and the Virgin Islands. Now, there's no dispute that Congress was not trying to add Guam and the Virgin Islands as the 51st and 52nd States of the Union. What it meant is when applying the provisions of this section, treat Guam and the Virgin Islands as if they are States. So you are you finished there? Yes, Your Honor. Would you go back for a minute to think before this Act was passed, the Gonzales Act, and think of the millions of government employees, and they are in different parts of the country, and some of them commit batteries. Now, you told me before that where an injured person, a plaintiff, sues a government employee, and they sue under State tort law, and they say, this government employee committed a battery, okay, in the course of duty. You say there was an immunity there. Where did the immunity come from? It was a common law absolute immunity. One case is the Martinez v. I mean, what was the theory of it? Here it's just a person, he's at work, he does happen to work for the Federal government instead of working for someone else, and everybody else you'd have to respond, and if liable, you'd have to pay damages for the battery. Now, where did the immunity come from that the Federal employee didn't? The theory behind the individual immunity was the same, essentially the same theory behind the Westfall Act immunity that this Court rejected in the Westfall Act decision. So up until Westfall, there was an argument that there was absolute immunity, that the individual government employees had absolute immunity. It was a common law immunity that it was an offshoot of the sovereign immunity, and it conferred it on the individual employee. This Court, and of course in Westfall, rejected that notion and said, you know, that employment and that apply, that involve discretionary policy decisions at a high enough level. The last point I would make, Your Honor, is even if you believed, and I think you do, that the texts were more naturally read to favor Petitioner, that is not enough. And I think you can look at this Court's decision in Nordic Village. The statutory provision in that case made certain bankruptcy court determinations binding on the government, notwithstanding any assertion of sovereign immunity. The relevant language is reproduced in footnote 10 on page 41 of our brief. That language, notwithstanding any certain assertion of sovereign immunity, sounds awfully like a waiver of sovereign immunity. It seems pretty explicit. But what this Court said in applying the unequivocal waiver requirement in finding that there was no waiver of sovereign immunity, despite that very explicit language, was that the statute nonetheless performed a significant function. Here, the same is true. Section 1089e, though not authorizing monetary relief, still undisputably performs a function here. It performs a function of securing the personal immunity conferred by Section 1089a, that is, for purposes of the Gonzalez Act. The conferral of immunity under Section 1089a, just as in Nordic Village, that is enough to construe the statute against a waiver of sovereign immunity. Roberts So you want us to decide the case with the unequivocal question before us, in other words, deciding whether that benefit to the government applies in this type of case. It seems to me to be you're really upping the ante here, and it may well be I have no idea why the government took the opposite position below, but that's putting a lot more at stake in this case than the particular statutory provision. Well, Your Honor, there are four courts that have decided, conclusively spoken, to my knowledge, four courts in the history that have interpreted this provision, Section 1089e, all have come out in the government's favor. There were two district court decisions before the Smith case, both came out in the government's favor. The only two decisions I'm aware of are the two decisions in this case, conclusively interpreting 1089e, the district court and the court of appeals. Both courts in this case relied on the unequivocal waiver requirement, and I think that that — it's not a stretch at all to apply the unequivocal waiver canon here. In fact, this case is far afield from Dolan. It would be a substantial expansion of the narrow exception in Dolan to say that the unequivocal waiver requirement didn't apply. There was no dispute that sovereign immunity applied the day before the Gonzales Act was enacted. So the only question is whether the Gonzales Act enacts a new waiver of sovereign immunity. That is the type of situation in which the canon applies most strongly, and Congress did it in a separate statute. Again, in Dolan, we were interpreting provisions that everyone agreed were part and parcel of the FDCA that altered the balance of sovereign immunity. Here, the question is whether it even affects or amends the FDCA in the first place, whether it means to affect the sovereign immunity balance in the first place. That's an especially strong case in which we would want an unequivocal waiver. Ginsburg. Mr. Shah, does it make any sense to distinguish between a medical malpractice negligence and this unconsented operation? To split those two and say the government is liable for malpractice, but not for this unconsented action? Your Honor, I think it makes a lot of sense, and here's why. When Congress enacted the intentional tort exception itself in 1946, one of the principal reasons it did that was because intentional tort claims are sometimes easier to allege but more difficult to disprove. That is particularly true with respect to these sort of lack of consent claims, where you have a patient who has signed consent forms, agreed to a surgery, and says — and the facts of this case, I think, are illustrative — says, right before the anesthesia kicked in, I said I don't want the procedure anymore. Now, here the government was successful in winning on summary judgment dismissal of the actual medical negligence claim, that the doctor's standard of care didn't — that doctor's care didn't meet the standard of care. Government won summary judgment on that because there could — there was no evidence, no expert testimony that supported the judge's claim. But his claim that I said no right before the anesthesia kicked in survived summary judgment, and I think it was correct to survive summary judgment. But the problem is that that survived summary judgment, even though the deposition testimony, as pointed out in the government's brief, everyone else in the operating room, including the doctor, said that this patient did not so object. It just shows that these claims are not correct. Scalia, could I ask you why, if your interpretation is correct, subsection E did not read, not for purposes of this section, but rather for purposes of subsection A, provisions of section 2680H shall not apply? May I respond, Your Honor? This section, subsection A, B, and C all work in tandem. D is a settlement provision that really doesn't have anything to do with this. So when it says for purposes of this section, subsection A and this section are essentially the only operative provisions of the Act. The only other provisions that do any work are E and F, which come after, obviously, subsection E. So when Congress used the term for four purposes of this section, I think the fair statement is it was referring to subsections A through C. Thank you. Roberts. Thank you, counsel. Mr. Feldman, you have four minutes remaining. I just wanted to make a couple of quick points. One is the Court has not applied the clear state, the unequivocal statement standard any time in the Tort Claims Act, not just when it's dealing with exceptions, but if you go back to the very early cases, the Aetna case, the Yellow Cab case, really right after the Act was passed, you can see that the Court is saying there, no, we want to interpret this Act consistent with Congress's intent, the way it wanted to interpret it, which is with a fair reading of its words, not in one direction, not in the other. I just also wanted to clarify in the Smith case, because of a possible misunderstanding. The Court definitely addressed the Gonzales Act repeatedly in its opinion in the Smith case, but it didn't — the Court did not actually address 1089e. The reason the government, though — this was important to the government, and actually the government's reply brief in the Smith case was, I think, 100 percent about the Gonzales Act — was that the other side of the Gonzales Act was saying if you construe the Westphal Act the way the government wants, that will be an implied repeal. The Gonzales Act will have nothing left to do. And it was important for the government — that's why they kept saying it — it was important for the government to say, no, the Gonzales Act does have things to do. This is not an implied repeal. And one of the things it does is exactly what we say section 1089e does. If there are no further questions. Roberts. Mr. Feldman, the Court invited you to brief and argue this case as an amicus curiae, and you have ably discharged that responsibility, for which the Court is grateful. Feldman. The case is submitted.